In the Matter of JOSEPH DI GIACOMO et al., Appellants, v CITY OF NEW YORK et al., Respondents.

First Department, July 14, 1977

*Richard A. Dienst* of counsel *(Schofield & Dienst,* attorneys), for appellants.

*Irving Cohen* of counsel *(Leonard Koerner* with him on the brief; *W. Bernard Richland, Corporation Counsel),* for respondents.

LUPIANO, J. Special Term aptly described this article 78 proceeding as one "for a judgment requiring respondents to pay to petitioners, who are retirees on ordinary disability after more than twenty years of service, a pension for increased take-home pay for service time beyond twenty years of service." The sole issue presented on appeal is whether Special Term was correct in granting the respondents' cross motion to dismiss the petition on the ground "that, as a matter of law, petitioners have not stated a cause of action for pension benefits, *in addition* to those prescribed in the applicable statute, Section B18-46.0 of the Administrative Code of the City of New York" (emphasis supplied). Accordingly, the petition must be scrutinized and given every fair intendment.

In essence, it is asserted that petitioners were members of the New York City Police Department, serving in the rank of Captain, Deputy Inspector, Inspector and Deputy Chief Inspector who retired for an "ordinary disability" pursuant to section B18-46.0 of the Administrative Code of the City of New York after January 1, 1967 and after completion of 20 years of service. At all material times, petitioners were and still are members of the Police Pension Fund, Article II.[1] The Captains Endowment Association, the collective bargaining representative of the petitioner, it is alleged, entered on or about May

---

1. "The article 2 police pension fund, designed as an actuarially sound retirement system, was established by the same local law for the benefit of certain members of the police department entering its service after the effective date of the enactment. The legislature later confirmed, legalized, and validated the local law establishing these funds, but this enactment has been held to be a 'curative statute,' or one which was intended only to overcome doubts about the possible invalidity of the local law, and it did not demonstrate a legislative intent to supersede what the city's legislative body had done or to occupy a local field in which the city was constitutionally authorized to act" (44 NY Jur, Pensions and Retirement Systems, § 161; See *Gorman v New York,* 280 App Div 39, affd 304 NY 865, remittitur amd 304 NY 973). In *Gorman v New York* (p 43), this court recognized that it was "fully demonstrated that the cities of this State have quite generally felt themselves competent by local laws to deal with pension statutes of the Legislature in the exercise of what they deemed their constitutional powers since 1938. The cumulative effect of these practical constructions of constitutional power has a very considerable force. We hold the city was vested with legislative power to amend in 1951 its own pension statute of 1940". It was also aptly noted that the curative State statute of 1940, even if regarded as a pension act of the Legislature, *was not an emergency law* within the definition of section 12 of article IX of the Constitution (now art IX, § 2, subd [b], par [2]) to which the exception upon local legislative power stated in that section applies.

10, 1968 into a contract with the city. This contract is embodied, on this record, in written memoranda, to wit, a letter dated May 10, 1968 to the city's then Director of Labor Relations, Herbert Haber, subscribed by legal counsel for the Captains Endowment Association and the response thereto dated May 13, 1968, subscribed by the Director of Labor Relations and said counsel. In pertinent part the memoranda of the agreement provides as follows: in the letter of May 10, 1968: "This agreement covers all of those members of the Police Department of the City of New York holding the rank of: Captain, Deputy Inspector, Inspector, Deputy Chief Inspector, Surgeon, Deputy Chief Surgeon, and Chief Surgeon, referred to below as 'members'; and, pertains to the 27 month period beginning July 1, 1966 and ending September 30, 1968, unless otherwise indicated * * * 8. Retroactive to January 1, 1967 the City shall contribute five percent to the pension for increased take home pay of each member with each member receiving an appropriate cash refund as a result of this increased City contribution. This cash refund shall be distributed to each member no later than sixty days after enactment into law of the enabling legislation. 9. *The City's pension contribution providing for increased take home pay shall be applicable to members who have more than 20 years of service* even though these members are not now required to contribute to the pension system, *Thereby increasing their retirement accordingly*" (emphasis supplied); in the letter of May 13, 1968: "3. *Pension Benefit* With respect to *members who have completed 20 years of service, effective January 1, 1967, the City will provide a pension for increased take-home pay* at the rate of 5% for each year of service after the completion of 20 years of service and after January 1, 1967" (emphasis supplied).

Before continuing this summary of the petition, it is noted that retirement from the police force is provided for in sections B18-45.0, B18-46.0 and B18-47.0 of the Administrative Code. The sections are entitled as follows: "§ B18-45.0 Retirement allowances; for service"; "§ B18-46.0 Retirement allowance; for ordinary disability" and "§ B18-47.0 Retirement allowances; for accident disability." on June 16, 1968, section B18-45.0 of the Administrative Code was amended by adding paragraph (b) to subdivision 2 which provides that for each additional year of service in the police force, or fraction thereof, beyond his required minimum service, a member

shall be additionally entitled to "a pension-providing-for-in-creased-take-home-pay which shall be the actuarial equivalent of the reserve-for-increased-take-home-pay to which he may be entitled, if any, for all periods of such service in the police force rendered both (1) after the completion of such required minimum service in such police force and (2) after December thirty-first, nineteen hundred sixty-six." The headnote to this amendment (L 1968, ch 587) reads as follows:

"An Act to amend the administrative code of the city of New York, in relation to providing a pension-providing-for-increased-take-home-pay for service beyond minimum service *for members of the police pension fund, article two* Became a law June 16, 1968, with the approval of the Governor. Passed on Home Rule request pursuant to article IX, section 2(b)(2) of the Constitution by a majority vote, three-fifths being present" (emphasis supplied).

Continuing with a summary of the petition: It is asserted that the amendment to section B18-45.0 was in implementation of the contract provisions entered into on or about May 10, 1968; that after the amendment, members of the Police Pension Fund, article 2, who retired for service or for accidental disability and who had more than 20 years of service, received the additional pension-for-increased-take-home-pay for their service beyond 20 years whereas petitioners, all of whom retired for ordinary disability, have not and are not receiving such additional pension for their service beyond 20 years. Admittedly, petitioners are receiving under section B18-46.0 a pension providing for increased-take-home-pay for their service *prior* to their obtaining 20 years of service. Petitioners declare that pursuant to the 1968 agreement they are entitled to the additional pension-for-increased-take-home-pay for their service beyond 20 years as are *all members* of the Police Department holding the ranks specified in the agreement who have completed 20 years of service and that the refusal to grant such additional pension to those members who have retired for ordinary disability beyond their 20 years of service (such as petitioners herein) while granting it to those members who have retired for accidental disability or have retired for service constitutes an impairment of contract, denies petitioners the equal protection under the law and reduces their pension in violation of the New York State Constitution, all without due process. Clearly, the petition states a cause of action.

Indeed, when this special proceeding first appeared on Special Term's calendar it was marked off by order entered November 28, 1975 (SAYPOL, J.) subject to restoration on 20 days' notice with the following pertinent observations: "The respondents state that the petitioners are receiving the pension referred to and have submitted an expert's conclusory affidavit in support. Ordinarily, the Court would direct a trial on an issue so clearly established. Here, resolution of the issue by trial would necessitate testimony relating to mathematical calculations in twenty separate situations, scarcely a subject which lends itself to such a forum. Though this is a special proceeding there is good reason to permit the issue to be narrowed, if possible, by use of disclosure (CPLR 408)". Respondents were directed to serve a statement setting forth as to each petitioner a particularized computation of the total retirement allowance with leave to petitioners to restore this application to the calendar within 45 days after receipt of the statement. The statement having been served and the matter restored to the calendar, petitioners moved for summary judgment. Respondents cross-moved for summary judgment. CPLR 3212 and not CPLR 3211 is involved.[2]

Viewing the record in this manner, issues warranting a trial are presented. Petitioners unequivocally state that they are being deprived of the additional pension-for-increased-take-home-pay provided for by the 1968 agreement. Respondents similarly declare that petitioners are receiving such pension. However, this assertion is qualified by respondents to the effect that petitioners are "receiving precisely the benefit * * * under the provisions of Section B18-46.0 of the Code" which they point out does not contain a provision equivalent to paragraph (b) of subdivision 2 of section B18-45.0. In response, petitioners assert that the failure to provide them with the additional pension effectuates a reduction of their pension benefits under subdivision 3 of section B18-46.0. It is claimed that "the purpose of the City's contributions for increased-take-home-pay and the Pension based on same, *was not to reduce an existing Pension (namely, '3' of § B18-46.0), by substituting or adding another Pension benefit (namely, Pension based on I.T.H.P. on contributions by the City after*

---

2. In dismissing the petition for failure to state a cause of action for pension benefits, Special Term, in effect, overruled a Justice of co-ordinate jurisdiction and violated the "law of the case."

*the member's 20th year of service)* * * * No-where in law does it state that this was the purpose or that this should be done."

We are confronted with mixed issues of law and fact. Respondents in essence contend that petitioners are receiving what they are entitled to under section B18-46.0 and that any increase in retirement allowance not provided for by said statute would be unlawful. Petitioners, ordinary disability retirees, contend that the additional pension contracted for is embraced within section B18-46.0 and that in any event they are entitled to it by contract and that such additional pension is given to others who retired for service or for accident disability. With respect to accident disability, respondents do not demonstrate that a provision similar to section B18-45.0 (subd 2, par [b]) is embraced within section B18-47.0.

In addition to the mandamus aspect of their application, petitioners also seek declaratory relief. The core of the dispute between the parties is the intent, effect, validity and possible breach of the alleged 1968 agreement. Respondents' argument that the matter is solely of concern to the Legislature assumes that section B18-46.0 does not provide for the additional benefit, an issue not clear on this record. Note is taken of section 1 of article VIII of the New York State Constitution which permits the city to increase the pension benefits payable to retired members of a police department. It may well be that it was contemplated that the city would, if necessary, initiate a home rule request to effectuate the contract provision for the additional benefit for petitioners as members of the police pension fund, article two.[3]

"Further, where a proceeding is instituted by the members or retired beneficiaries of a public retirement system against those responsible for its operation and administration * * * to correct an action alleged to have been arbitrary and illegal and in contravention of the petitioners' contractual rights, it has been held that the proceeding is subject to the 6-year statute of limitations, and that the prescriptive period does not commence to run until a demand for relief has been made" (44 NY Jur, Pensions and Retirement Systems, § 27).

Study of this court's opinion in *Matter of Carroll v Grumet* (281 App Div 35 ) which involved waiver of a claimed pension right is instructive. It was observed (pp 37-38) that "[s]ection 7

---

[3]. The headnote to the amendment to section B18-45.0 is so broadly worded (L 1968, ch 587).

of article V of the New York State Constitution expressly provides that: 'membership in any pension or retirement system * * * shall be a contractual relationship, the benefits of which shall not be diminished or impaired.' This provision indicates a public policy in support of agreements regarding pension rights. By terming membership in a retirement system a 'contractual relationship' the Constitution obviously authorizes agreements with respect thereto, for nothing could be more inherent in a 'contractual relationship' than the right of the parties to agree with respect to the terms and conditions of such relationship. The pension statute, which constitutes part of the contract between the parties, in the present situation, leaves open to the city the discretion to fix the salary upon which the amount of an employee's pension is to be computed. [Citations.] If the constitutional declaration that the pension relationship is 'contractual' is to be given any effect, it must be construed as authorizing bargaining between the parties, for their mutual interest, with respect to pension rights."

Assuming the contractual terms agreed to by the parties as averred by petitioners, those terms will be favored unless sufficient constitutional or statutory objection is shown. Retirement awards were held to be an item subject to collective bargaining between public employer-employee in effectuating the public benefit purpose of the provisions of the Taylor Law (Board of Educ. v Associated Teachers of Huntington, 30 NY2d 122). In this key case, the notion that nothing is negotiable in the public sector if it is covered by a statute or unless a statute permits negotiability was rejected. In 1973 the Legislature enacted a law specifically prohibiting negotiations with respect to pension benefits and removing pension benefits as a term and condition of employment (L 1973, ch 382). The law was approved May 31, 1973 to take immediate effect with the proviso that (§ 73) "nothing contained in this section shall be deemed to invalidate any agreement concluded prior to the date on which this act shall become a law." The purported 1968 agreement upon which petitioners rely is not vitiated by this statutory enactment. Further, "section 8 of article VII specifically empowers the Legislature to legislate on pensions: '2. * * * nothing in this constitution contained shall prevent the legislature from providing * * * for the increase in the amount of pensions of any member of a retirement system of the state, or of a subdivision of the state

* * *. The enumeration of legislative powers in this paragraph shall not be taken to diminish any power of the legislature hitherto existing.' In regard to section 8 of article VII of the New York State Constitution, 'The constitutional provision was not intended and should not be construed to make impossible the performance of an honorable obligation founded upon a public service, invited by the State, adopted as its agency for doing its work, and induced by exemptions and reward which good faith and justice require should last so long as the occasion demands.' *(Trustees of Exempt Firemen's Benevolent Fund v Roome,* 93 N.Y. 313, 327.) Although there had been no legal obligation to increase the policemen's pension benefits, there was a moral obligation. But when the county, with authority delegated to it from the State, contracted with the Police Benevolent Association (PBA) and incorporated the retirement award into their employment contract, then it became a valid legal and enforceable promise. It is now transformed into an 'honorable obligation founded upon their past services and the injuries and suffering which those had occasioned' *(Trustees of Exempt Firemen's Benevolent Fund v. Roome, supra,* p. 326.) * * * Any attempt to be relieved of this promise would be a disincentive contrary to the purposes of the Taylor Law (Civil Service Law, art. 14, § 200), against public policy, bad faith bargaining, and not in the interests of justice. Since section 8 of article VII gave the Legislature power to increase pension benefits, under the Taylor Law this power can be delegated to the 'public employer' * * * The public employer under the Taylor Law is empowered to enter into binding collective negotiations as to the terms and conditions of employment in the form of employee rights and benefits not otherwise authorized by law. (Civil Service Law, § 204, subd. 1.) * * * In 1967, the Taylor Law delegated to the local governments the power to negotiate collectively in the name of the State. This law supersedes any inconsistent provision of the earlier Retirement and Social Security Law which does not coincide with the stated purposes of this new Civil Service Law (§§ 200-212 [Taylor Law]). Whereas the [local government] cannot confer additional benefits by its own power, it can confer these benefits through the State's power given in whole to the [local government]. If it were otherwise, and the [local government] never possessed power to negotiate on this point, but held itself out as having such, then it would constitute bad faith on the part of the [local government] for so deceiving the Police Benevo-

lent Association. But here as before, the court will infer good faith and hold that the [local government] bargained in full honesty believing that they had full authority. They cannot now raise section 113 of the Retirement and Social Security Law as a defense since to do so would be bad faith" *(Lecci v Nickerson,* 63 Misc 2d 756, 761-763).

"As a general rule, the law in force at the time of the execution of a contract controls its construction and effect. Generally, the validity of a contract depends upon the law as it existed at the time it was made, except that it may be affected by subsequent legislation *in the exercise of the police power,* or by a subsequent statute announcing a new public policy * * * or by repeal of a prohibitory act" (10 NY Jur, Contracts, § 129; emphasis supplied). Respondents fail to point out any subsequent statute enacted in the exercise of the police power or announcing a new public policy which would affect the validity of the agreement upon which petitioners rely. The legislative enactment in 1973 removing pension benefits as a term and condition of employment and prohibing negotiations with respect to same, even if deemed an exercise of the police power or enunciation of a new public policy, was specifically made prospective only.[4]

It is undisputed that Thomas McMahon was erroneously

---

4. Assuming this matter to be "ripe" for summary determination, notice must be taken of petitioners' argument for relief in their favor based upon the doctrine of equitable estoppel. They argue, supported by an actuarial expert (Thomas W. Fitzgerald, former Chief Adminsitrator of the New York City Police Pension Fund, article II and now an officer of Martin E. Segal Company, consultants and actuaries) that a member who has completed 20 years of service is not required to make any further contributions to the pension fund, but that he may do so, in which event upon retirement he would be entitled to a refund of such excess contributions or an additional annuity. In reliance on the collective bargaining agreement which provides, *inter alia,* that the "City's pension contribution providing for increased take home pay shall be applicable to members who have more than twenty years of service even though these members are not now required to contribute to the pension system, thereby increasing their retirement allowance accordingly," these petitioners did not elect to make further contributions beyond 20 years of service. If they were making such contributions, it would be taken into consideration in determining the total retirement allowance. Accordingly, the increased take home pay benefit should be construed as an excess benefit earned in addition to any other benefits and the city should be equitably estopped from depriving them of that benefit. "Although estoppel in pais is not readily presumed as against the state, and there can be no estoppel against the state which will impede the exercise of sovereign powers for the protection and benefit of the people, in a proper case, the state may be estopped, the same as an individual, by representations and conduct, provided its officers and agents through whom it is attempted to charge the state with such representations and conduct *were acting with authority"* (21 NY Jur, Estoppel, Ratification, and Waiver, § 77; emphasis supplied). "A municipal corporation acting in a corporate or proprie-

included as one of the petitioners herein and, therefore, dismissal as to this named petitioner was correct.

Although responding to an assertion is sometimes construed as giving credence to that assertion, clarity impels response to the charge that I have "essayed to decide" some of the mixed issues of law and fact. This is not so. CPLR 3212 (subd [g]) declares, in part, that "[i]f a motion for summary judgment is denied * * * the court, by examining the papers before it and, in the discretion of the court, by interrogating counsel, *shall, if practicable,* ascertain what facts are not in dispute or are incontrovertible" (emphasis supplied). Professor Siegel in his Practice Commentaries to this particular subdivision, perspicaciously states: "This is a provision of great value in practice. Many if not most motions for summary judgment are denied, and the only product of the substantial expenditure of time and effort by both the lawyers and the Judge is very often an order which reflects only the denial but which makes no effort to set forth at least those few facts, if any, which clearly emerged from the motion papers * * * The press of judicial business in this era of the crowded calendar deprives this provision of its real potential * * * In the hands of a busy judge, the phrase 'shall, if practiciable' often gets theoretically reduced to 'may' and practically reduced to 'cannot - no time.' If the clouds should ever part, CPLR 3212(g) will be one of the rays they let through" (McKinney's Cons Laws of NY, Book 7B, C3213:35). In the spirit of this section and although subscribing to the plaint of a heavy and busy schedule in the resolution of appellate matters, the nature of the issues raised in this appeal requires that the litigants and the Supreme Court be afforded whatever guidance and explication can be gleaned from the record. I have sought to do this by (1) clarifying the issues and (2) where appropriate, resolving the historical and factual context in which those issues are presented. The appropriateness of this approach and the laudatory motives by which it is undertaken are further highlighted by the presence not of simple issues of fact, but of *mixed*

---

tary capacity, as distinguished from a governmental capacity, may be estopped by the authorized representations and conduct of its officers and agents the same as any other corporation. It may be estopped in the exercise of its contractual powers. A city having received the benefit of the services rendered by a party under the terms of a contract it may not, any more than an individual, enrich itself through misrepresentations. For example, the general principles with reference to estoppel by acquiescence or inconsistent position have been applied so as to invoke estoppel against a municipality" (21 NY Jur, Estoppel, Ratification, and Waiver, § 79).

*issues* of law and fact. With this apology to the view of the concurrence, it merely remains to state that the extended analysis delineated above serves to demonstrate that genuine issues are raised in this proceeding warranting a plenary hearing. Critical to resolution of the dispute is the intent, effect and validity of the 1968 agreement and the reasonable and warranted interpretation of the application of such agreement viewed against the statutory enactments alluded to herein. CPLR 1012 (subd [c]), effective September 1, 1972, provides that "[w]here public retirement benefits, paid, payable, *claimed, or sought to be paid by* a state retirement system or *any* other *retirement system established for public employees within this state* or any subdivision thereof, or the *interpretation of any provisions of law* or rules governing any such retirement system or the operation thereof, are involved in an action to which the comptroller of the state of New York is not a party, the court shall notify said comptroller, who shall be permitted, in his discretion, to intervene in such action or to file a brief *amicus curiae"* (emphasis supplied). This section has the salutary goal of enabling the court to make a ruling on a retirement question with the benefit of the expertise and information which the Comptroller can supply.

In response to the views of my colleague, Justice SILVER-MAN, I note the following: The separability of contract rights and rights in respect of the regulation of government is a critical factor in analyzing the instant dispute. Assumption without legal justification that respondent has correctly computed the petitioners' retirement allowances because "in the case of retirement for ordinary disability, an increase of item 2, the pension for increased-take-home-pay, merely reduces item 3," must take cognizance of section 7 of article V of the State Constitution which provides that "membership in" a pension system is a "contractual relationship" and that the "benefits" of the relationship shall not be "diminished or impaired." No evidence of the interpretation placed upon the agreement by the parties other than the agreement itself has been advanced on this record by the parties and supposition cannot substitute for such evidence. Finally, we are concerned with motions for summary judgment in which event "issue-finding, rather than issue-determination, is the key to the procedure" *(Esteve v Abad,* 271 App Div 725, 727).

Accordingly, the order of the Supreme Court, New York County (KORN, J.), entered July 28, 1976, and the judgment of

said court entered August 6, 1976, which denied petitioners' motion for summary judgment and granted the respondents' cross motion to dismiss the petition, should be modified, on the law, to the extent of denying the respondents' cross motion to dismiss except as to petitioner Thomas McMahon and as so modified, should be affirmed, without costs and disbursements, and the matter remanded to Special Term for a hearing with the direction that Special Term notify the Comptroller of the State of New York pursuant to CPLR 1012 (subd [c]).

MARKEWICH, J. (concurring). I concur in the result arrived at by Justice LUPIANO. This case does not lend itself to summary judgment in that there are mixed issues of law and fact. However, my colleague has essayed to decide some of these issues, which may not be done at this juncture. "The court is not authorized to try the issue, but is to determine whether there is an issue to be tried." (*Dwan v Massarene*, 199 App Div 872, 879.)

CAPOZZOLI, J. (concurring). I join Justices LUPIANO and MARKEWICH in voting for a modification of the determination below. It seems to me that the agreement represented by the letters of May 10, 1968 and May 13, 1968, Exhibits A and B respectively, is perfectly valid. Any suggestion that the city was without authority to enter into this agreement is disposed of by the case of *Board of Educ. v Associated Teachers of Huntington* (30 NY2d 122) where it was made clear that a public employer is empowered to recognize an employee organization for the purpose of collective bargaining negotiation, so as to mutually agree on the terms and conditions of employment. That is exactly what happened in the case at bar and the city should be held to its bargain. At the very least the appellants are entitled to a hearing.

SILVERMAN, J. (dissenting). We would affirm the judgment appealed from.

We think there is no issue of fact in the case requiring a trial. We have simply a question of interpretation of a statute, section B18-46.0 of the Administrative Code of the City of New York, and two written intruments—a question of law. The case is ripe for final judgment for one side or the other.

The issue in this case is whether New York City police officers who are retired on ordinary disability after more than 20 years of service are entitled to have their total retirement allowance increased by a pension for "increased-take-home-

pay" for service time beyond 20 years of service. I think they are not.

The governing statute is section B18-46.0 of the Administrative Code. Plainly, and really by definition, the statute does not provide for such a pension on top of the statutory retirement allowance. That really should be the end of the matter.

Petitioners contend, however, that a collective bargaining agreement entered into in May, 1968 by their labor union, the Captains Endowment Association, requires such an additional pension.

The letter agreement of May 10, 1968 provided in relevant part:

"8. Retroactive to January 1, 1967 the City shall contribute five percent to the pension for increased take home pay of each member with each such member receiving an appropriate cash refund as a result of this increased City contribution. This cash refund shall be distributed to each member no later than sixty days after enactment into law of the enabling legislation.

"9. The City's pension contribution providing for increased take home pay shall be applicable to members who have more than 20 years of service even though these members are not now required to contribute to the pension system, thereby increasing their retirement allowance accordingly."

The letter agreement of May 13, 1968 provided in part:

"3. *Pension Benefit*

"With respect to members who have completed 20 years of service, effective January 1, 1967, the City will provide a pension for increased take-home pay at the rate of 5% for each year of service after the completion of 20 years of service and after January 1, 1967."

"Full details of the agreement" were to be "spelled out in a formal contract to be entered into at a later date." But the letter agreement was nevertheless expressly declared to be binding on both sides.

In our view, the primary thrust of this agreement was to benefit the usual case of officers who retired for service (pursuant to Adminsitrative Code, § B18-45.0), rather than on disability (pursuant to Administrative Code, § B18-46.0).

This was obviously the contemporaneous interpretation of the parties. Almost immediately following the letter agreement, the police pension fund statute was amended to carry

into effect this agreement (L 1968, ch 587, eff June 16, 1968). The amendment added paragraph (b) of subdivision 2 to section B18-45.0 so as to provide:

"2. For each additional year of service in the police force, or fraction thereof, beyond his required minimum service, a member shall be entitled to, in addition to the benefits provided in subdivision one of this action: * * *

(b) a pension-providing-for-increased-take-home-pay which shall be the actuarial equivalent of the reserve-for-increased-take-home-pay to which he may be entitled, if any, for all periods of such service in the police force rendered both (1) after the completion of such required minimum service in such police force and (2) after December thirty-first, nineteen hundred sixty-six."

The amendment thus made was an amendment only of section B18-45.0, the service retirement section and not of section B18-46.0, the ordinary disability retirement section. This cannot have been an oversight.

It is true that petitioners, having retired for ordinary disability, did not actually have their pension increased because of the quoted provision of the contract. But at the time the contract was entered into there was presumably no way of knowing whether any particular officer would ultimately retire for service, or for ordinary disability, or for accident disability. The vast majority of officers, of course, would presumably retire for service. Thus petitioners, along with all other officers, received the assurance at the time of the contract that if, as was most probable, they ultimately retired for service, they would have an increased pension because of the contract. Indeed, petitioners, having served more than 20 years (all but two of them more than 25 years), could presumably have elected to take service retirement (Administrative Code, § B18-4.0, subd c) and thus have had a pension increased because of the contract provisions. As it turned out, these petitioners retired for ordinary disability where the scheme of retirement is such that the increased-take-home-pay provision made no monetary difference in the pensions (but presumably resulted in an over-all retirement allowance greater than if petitioners had chosen service retirement).

It is not unusual in labor contracts to have a general provision in terms applicable to all employees which, however, in a particular contingency, brings no additional benefit to a special subgroup because, in that contingency, they already

have a special provision governing their case which is either just as good or better than the general contractual provision or so specially constructed that the general contractual provision does not increase their benefits.

That, indeed, was the case here with respect to the contingency of retirement for ordinary disability. For, in essence, in that contingency, the officers already had a guarantee of a total retirement allowance beyond the pension for increased-take-home-pay. Therefore an increase in the pension for increased-take-home-pay made no difference to them as long as the increase would not bring their total retirement allowance beyond the guaranteed retirement allowance. In a sense this was not because they were not getting the benefit of the increased-take-home-pay provision but rather because, to the extent that they got such benefit, it merely duplicated a benefit which they were already guaranteed.

This is apparent from the structure of the statute with respect to ordinary disability. Thus section B18-46.0 provides:

"Upon retirement for ordinary disability, a member shall receive a retirement allowance which shall consist of:

"1. An annuity which shall be the actuarial equivalent of his accumulated deductions at the time of his retirement; and

"2. A pension which is the actuarial equivalent of the reserve-for-increased-take-home-pay to which he may then be entitled, if any, and

"3. A pension, which, *together with his annuity and the pension, providing-for-increased-take-home-pay,* if any, shall be equal to" (emphasis added).

Thus, in the case of retirement for ordinary disability, an increase of item 2, the pension for increased-take-home-pay, merely reduces item 3. In this respect, the statutory structure and provision with respect to retirement allowance for ordinary disability are different from those for service retirement or accident disability retirement, in both of which the statute then and now does not provide for crediting the pension for increased-take-home-pay against some other over-all guaranteed figure but adds it on top of other provisions.

We note that the percentage provisions for ordinary disability retirement allowance are apparently such that for each year of service in excess of 20 years, ordinary disability retirees receive a larger benefit than either service retirees or accident disability retirees.

We should be very cautious in the consideration of a claim made eight years after a contract is written that it extended pension benefits to an area apparently not recognized by the parties at the time. At least where the statute speaks with clarity, the statute is the only safe guide through the arcane area of public employees' pension rights.

· The suggestions that the judgment appealed from impairs or diminishes petitioners' pension rights in derogation of the State Constitution or violates their rights to equal protection seem to us to be without merit.

CAPOZZOLI, J., concurs in an opinion; MARKEWICH, J., concurs in an opinion; BIRNS and SILVERMAN, JJ., dissent in part in an opinion by SILVERMAN, J.

Order, Supreme Court, New York County, entered on July 28, 1976, and judgment entered thereon August 6, 1976, modified, on the law, to the extent of denying the respondents' cross motion to dismiss except as to petitioner Thomas McMahon and as so modified affirmed, without costs and without disbursements, and the matter remanded to Special Term for a hearing with the direction that Special Term notify the Comptroller of the State of New York pursuant to CPLR 1012 (subd [c]).